**Electronically Filed
Supreme Court
SCWC-23-0000743
17-JUN-2026
08:24 AM
Dkt. 13 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Petitioner/Plaintiff-Appellee,

vs.

SILBER M. JERCY,
Respondent/Defendant-Appellant.

SCWC-23-0000743

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-23-0000743; CASE NO. 1CPC-22-0000352)

JUNE 17, 2026

DEVENS, C.J., McKENNA, EDDINS, AND GINOZA, JJ.,
AND CIRCUIT JUDGE CATALDO, ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY DEVENS, C.J.

## I.  INTRODUCTION

This case centers on the factors a trial court must consider when a criminal defendant moves to suppress identification evidence from a field show-up.  The Intermediate Court of Appeals (ICA) correctly determined that the Circuit Court of the First Circuit (circuit court) overlooked certain

relevant factors that should have been considered when it denied defendant's motion to suppress. However, in remanding the case for a new trial, the ICA should have also determined whether, upon balancing all relevant factors as was required, the suppression motion was correctly denied. Given that the totality of the circumstances weighed in favor of granting the suppression motion on this record, we clarify that the motion should have been granted, and thus, the identification evidence shall be suppressed on remand.

## II. BACKGROUND

### A. Incident

According to trial testimony, the complaining witness (CW), who was sixty-nine years old at the time, was hanging laundry at her Halawa home on March 22, 2022, when a man she had never seen before attacked her by hitting her several times around her head. The man ran off and two of CW's neighbors separately chased after him. One neighbor, C. Hernandez (Hernandez), testified that he went after the man on his moped but lost sight of the man for ten to fifteen seconds during the chase. The other neighbor, J. Wainit (Wainit), drove off in a car with his "friend" but admitted that he did not get a "clear view" of the assailant.[1]

---

[1] The record does not identify Wainit's "friend."

The neighbors subsequently saw Respondent/Defendant-Appellant Silber M. Jercy (Jercy) sitting at a nearby bus stop (approximately one to two minutes away by moped, according to Hernandez's testimony), believing that Jercy was the man who had hit CW. The neighbors detained Jercy and called the police. Honolulu Police Department (HPD) Officer Alayna Benton (Officer Benton) arrived at the bus stop and handcuffed Jercy.

Back at CW's home, CW, whose primary language is Chuukese, verbally provided HPD with a brief description of the assailant. CW's granddaughter was present to interpret between Chuukese and English, but HPD did not obtain a written statement from CW at the time because of the language barrier.[2]

CW was told that HPD "had a male in custody" and that she "would identify him before [going] to the hospital." CW was then placed in an ambulance for transport to the hospital without her granddaughter or a Chuukese interpreter. The ambulance was then rerouted to the nearby bus stop to have CW identify her attacker. HPD Officer Jon Tomishima (Officer Tomishima) testified that although HPD wanted to instruct CW that the perpetrator may or may not be present in the show-up, Officer Tomishima was unable to provide that instruction due to

---

[2]     According to HPD Officer Jon Tomishima, a Chuukese translator was not available at the time.

the language barrier.

After the ambulance arrived near the bus stop, CW, who was sitting on a gurney in the back of the ambulance, was able to view Jercy through the rear windows.  During this field show-up, Jercy stood alone and remained handcuffed, with his hands behind his back and an HPD officer standing behind him.  No other persons were shown to CW.

CW identified Jercy as her attacker.  CW testified that she based her identification on Jercy's face.

B.   Relevant Procedural Background

Jercy was charged with assault in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 707-711(1)(m) (Supp. 2021).

Prior to his jury trial, Jercy moved to suppress CW's field show-up identification, arguing that the show-up was so suggestive that it was unreliable for presentation at trial.[3] Relying on our decision in State v. Kaneaiakala, 145 Hawai'i 231, 450 P.3d 761 (2019), the circuit court analyzed the facts in light of the relevant factors listed in Hawai'i Pattern Jury Instructions--Criminal (HAWJIC) 3.19 and determined that CW's identification was sufficiently reliable notwithstanding the

---

[3]     The Honorable Rowena A. Somerville presided.

suggestiveness of the field show-up.[4]  The circuit court denied

---

[4]      HAWJIC 3.19 reads as follows:

The burden of proof is on the prosecution with reference to every element of a crime charged, and this burden includes the burden of proving beyond a reasonable doubt the identity of the defendant as the person responsible for the crime charged.

You must decide whether an eyewitness gave accurate testimony regarding identification.

In evaluating identification testimony, you may consider the following factors:

The opportunity of the witness to observe the person involved in the alleged criminal act;

The stress, if any, to which the witness was subject at the time of the observation;

The witness's ability, following the observation, to provide a description of the person;

The extent to which the defendant fits or does not fit the description of the person previously given by the witness;

The cross-racial or ethnic nature of the identification;

The witness's capacity to make an identification;

Evidence relating to the witness's ability to identify other participants in the alleged criminal act;

Whether the witness was able to identify the person in a photographic or physical lineup;

The period of time between the alleged criminal act and the witness's identification;

Whether the witness had prior contacts with the person;

The extent to which the witness is either certain or uncertain of the identification and whether the witness's assertions concerning certainty or uncertainty are well-founded;

(continued . . .)

Jercy's suppression motion.

The jury later found Jercy guilty as charged.

On appeal, the ICA vacated the circuit court's judgment and remanded for a new trial. Applying Kaneaiakala, the ICA found that the circuit court erroneously failed to consider the relevant factors listed in HAWJIC 3.19A and the effect of the suggestiveness of the show-up on the reliability of CW's identification.[5] The ICA did not indicate whether CW's

---

        Whether the witness's identification is in fact the product of his/her own recollection; and

        Any other evidence relating to the witness's ability to make an identification.

HAWJIC 3.19 Eyewitness Testimony (eff. 2014).

[5]    HAWJIC 3.19A reads as follows:

        In this case, in addition to other eyewitness identification testimony, you have received evidence that the defendant was identified by a witness at a so-called "show-up" conducted by the police. While show-ups are permissible, they are inherently suggestive police procedures. In determining the reliability and accuracy of an identification made at a police show-up, you must consider the totality of the circumstances involved in the show-up, which may include the following:

        Whether the identification was the result of a suggestive procedure, including actions taken or words spoken by police or anyone else to the witness before, during, or after the identification process;

        Whether the police either indicated to the witness that a suspect was present in the procedure or failed to warn the witness that the perpetrator may or may not be in the procedure;

        Whether the defendant was required to wear distinctive clothing that the perpetrator allegedly wore, or was handcuffed or otherwise appeared to be in police custody;

(continued . . .)

6

identification would be admissible or was suppressed upon remand.

## C. State's Certiorari Application

On certiorari, the State presents four questions:

1.   Did the ICA gravely err or act inconsistently with prior decisions by requiring the Circuit Court to expressly address the factors in HAWJIC 3.19A in its admissibility determination?

2.   Did the ICA gravely err or act inconsistently with prior decisions when it vacated the Circuit Court's decision even though the Circuit Court did in fact consider the relevant factors regarding suggestiveness[?]

3.   Did the ICA gravely err or act inconsistently with prior decisions when it vacated the Circuit Court's decision based on the suggestiveness of the show-up when the real issue in this case was whether the identification was reliable notwithstanding suggestiveness?

4.   Did the ICA gravely err or act inconsistently with prior decisions by vacating Defendant's Amended Judgment of Conviction even though any errors in the identification by Complainant constituted harmless error?

We granted the State's application on April 29, 2026.

### III.   STANDARD OF REVIEW

With respect to whether an eyewitness identification should

---

Whether the witness was exposed to opinions, descriptions, or identifications made by other witnesses, or to photographs, news media, or to any other information that may have influenced the independence of the identification;

Whether other participants in the show-up were similar in appearance to the defendant;

Whether the witness's identification was made spontaneously and remained consistent thereafter; [and]

. . . any other circumstance relating to the witness's ability to make an identification.

HAWJIC 3.19A Show-Up Identification (eff. 2014) (brackets removed).

be suppressed, we have held that questions of suggestiveness and reliability are questions of law that are freely reviewable on appeal.  Kaneaiakala, 145 Hawai'i at 240, 450 P.3d at 770 (cleaned up).

## IV.  DISCUSSION

**A.  The circuit court should have considered the effect of suggestiveness on the reliability of CW's identification and the relevant factors provided by HAWJIC 3.19A.**

Before the ICA, the disputed issue was

> whether the Circuit Court erred in failing to consider the relevant HAWJIC 3.19A factors, the impact of the suggestiveness of the procedures used in the identification, and other relevant factors under the totality of the circumstances of the identification in its determination that [CW's] identification was reliable, notwithstanding that it was impermissibly suggestive.

The ICA determined that the circuit court erred because it was required to weigh these additional considerations and failed to do so in denying Jercy's motion to suppress.  We agree.

"A defendant is denied due process of law when the procedure used to obtain an eyewitness identification admitted at trial is 'unnecessarily suggestive and conducive to irreparable mistaken identification.'"  Id. at 240, 450 P.3d at 770 (quoting State v. Masaniai, 63 Haw. 354, 362, 628 P.2d 1018, 1024 (1981)).  However, "an eyewitness identification is not inadmissible merely because the identification procedure was impermissibly suggestive.  Rather, whether an eyewitness identification obtained through an impermissibly suggestive

8

procedure is admissible depends upon the reliability of the identification." Kaneaiakala, 145 Hawai'i at 240, 450 P.3d at 770 (cleaned up).

"While show-ups are permissible, they are inherently suggestive." State v. Cabinatan, 132 Hawai'i 63, 76, 319 P.3d 1071, 1084 (2014). Accordingly, the key issue before the circuit court was whether CW's identification was reliable notwithstanding the inherent suggestiveness of the show-up.

In vacating the circuit court's decision, the ICA applied Kaneaiakala. In Kaneaiakala, this court laid out the considerations a trial court must weigh when assessing the reliability of challenged show-up identifications:

> [T]rial courts must, at minimum, consider **any relevant factors set out in the Hawai'i Standard Instructions governing eyewitness and show-up identifications**, as may be amended, as well as any other relevant factors that may be set out in binding precedent in addressing whether, under a totality of circumstances, an impermissibly suggestive eyewitness or show-up identification is nonetheless sufficiently reliable to be admissible in evidence.

Kaneaiakala, 145 Hawai'i at 247, 450 P.3d at 777 (emphases added). The instructions "governing eyewitness and show-up identifications" are HAWJIC 3.19 and HAWJIC 3.19A, respectively. See id. ("[T]he factors a jury must consider in evaluating the reliability of an eyewitness or show-up identification must also be considered by a trial court in addressing admissibility of an impermissibly suggestive eyewitness or show-up

9

identification[.]" (emphasis added)). This court added that "trial courts must also consider the effect of the suggestiveness on the reliability of the identification in determining whether it should be admitted into evidence." Id. at 248, 450 P.3d at 778. Thus, the circuit court was required, "at minimum," to consider any relevant factors in HAWJIC 3.19 and HAWJIC 3.19A, the "effect of the suggestiveness on the reliability of the identification," and "any other relevant factors[.]" Id. at 247-48, 450 P.3d at 777-78.

Here, Jercy moved to suppress CW's identification. The circuit court held an evidentiary hearing and later issued findings of fact (FOFs), conclusions of law (COLs), and an order denying Jercy's motion to suppress.

The parties do not dispute that the circuit court considered the factors set forth under HAWJIC 3.19 in denying Jercy's motion. Indeed, the circuit court based its decision exclusively on those factors. The circuit court did not, however, consider the relevant factors listed in HAWJIC 3.19A or the effect of suggestiveness on the reliability of CW's identification.

As an initial matter, the State does not challenge the ICA's determination that the circuit court failed to evaluate the effect of suggestiveness on the reliability of CW's

identification.

As to HAWJIC 3.19A, the State argues that the circuit court was not required to expressly address those factors. Regardless of whether the circuit court was required to expressly address the 3.19A factors, the issue is that the court gave no indication that it based its decision on anything beyond the factors enumerated in HAWJIC 3.19. But Kaneaiakala requires more.

Six of the seven HAWJIC 3.19A factors were relevant to this case. See infra Section IV.C.2. The circuit court was thus required to consider these relevant factors. But there is no indication in the record that the circuit court did so. As stated, the circuit court's FOFs, COLs, and order denying the motion to suppress were based entirely on the HAWJIC 3.19 factors. At the hearing on Jercy's motion, the circuit court expressly addressed the HAWJIC 3.19 factors and then stated, "And so for those reasons, I will deny the motion."

The court's only mention of the HAWJIC 3.19A factors came right after it orally denied the motion: "I also, you know, if this goes to trial, will include the HAWJIC 3.19[A] which talks about the identification, the field show-up identification." This representation, coming after the oral denial of Jercy's motion, reflects that the circuit court did not evaluate the

HAWJIC 3.19A factors in making its decision, but rather delegated the evaluation of those factors to the jury.

The State contends that the circuit court did in fact consider these factors, citing the court's statements that it was considering "the totality of the circumstances." This argument is unavailing. Again, the circuit court did not indicate that its totality-of-the-circumstances balancing included anything other than the HAWJIC 3.19 factors.

The State also argues that "Kaneaiakala itself cannot be read logically as incorporating the factors in HAWJIC 3.19A in its analysis" because the first HAWJIC 3.19A factor (i.e., whether the identification was the result of a suggestive procedure) "is essentially the same as 'the effect of suggestiveness.'" We do not interpret these two factors as being the same.

The first HAWJIC 3.19A factor inquires as to whether the show-up procedure itself led to the identification (e.g., considering the impact of the suspect being handcuffed during the field show-up). The "effect of suggestiveness," on the other hand, pertains to whether the circumstances surrounding the identification affected the identification (e.g., considering the impact of HPD implying that the assailant would be present in the field show-up). Although these considerations

in some cases may be overlapping and inextricable to some extent, they nonetheless highlight distinct concerns regarding field show-ups.

Separately, the State argues that Jercy "never raised the argument regarding the HAWJIC 3.19A factors. . . .  The ICA raised the HAWJIC 3.19A argument sua sponte, and even worse, failed to request supplemental briefing on it."

HRAP Rule 28(b)(4) provides:

> If an appellate court, when acting on a case on appeal, contemplates basing the disposition of the case wholly or in part upon an issue of plain error not raised by the parties through briefing, it shall not affirm, reverse, or vacate the case without allowing the parties the opportunity to brief the potential plain-error issue prior to disposition.

The State is correct that the parties did not specifically address in their briefings before the ICA whether Kaneaiakala requires courts to consider the factors in HAWJIC 3.19A. However, because the State raised this issue on certiorari, it briefed the issue, and Jercy had an opportunity to do so as well.  Thus, supplemental briefing is neither necessary nor warranted here.

Based on the foregoing, we find that the ICA was correct when it concluded that the circuit court failed to consider the relevant HAWJIC 3.19A factors and the effect of suggestiveness in finding CW's identification sufficiently reliable.

13

**B.    The reliability of CW's identification should have been assessed.**

Although the ICA correctly concluded that the circuit court did not address the relevant HAWJIC 3.19A factors and the effect of suggestiveness, we hold that the reliability of CW's identification should have also been decided based on this record.

"With respect to whether an eyewitness identification should be suppressed, we have held that questions of suggestiveness and reliability are questions of law that are freely reviewable on appeal." Kaneaiakala, 145 Hawai'i at 240, 450 P.3d at 770 (cleaned up).

The ICA remanded the case to the circuit court for proceedings consistent with its Summary Disposition Order. But there was no indication from the ICA whether CW's identification would be admissible upon retrial. That is, it is unclear whether the circuit court, upon remand, is to reevaluate Jercy's suppression motion under all the relevant Kaneaiakala factors or simply exclude the identification evidence.

If Jercy's suppression motion is to be reevaluated by the circuit court, the court after considering the appropriate factors may again end up denying the motion. There would then be a new trial and Jercy would be retried with the same evidence that existed in the first trial. This outcome would constitute

14

an unnecessary expenditure of judicial resources and would be unduly burdensome on the parties.

The latter scenario (i.e., CW's identification evidence is automatically excluded on remand) would not be appropriate either. If CW's identification were sufficiently reliable, it would be unfair to the State, which presented argument on the 3.19A factors in opposing Jercy's suppression motion, to exclude the identification evidence simply because the circuit court did not consider the relevant factors as required. Cf. People v. Busija, 509 N.E.2d 168, 172 (Ill. App. Ct. 1986) ("[T]o order a retrial of the question of the accused's guilt without first determining there was reversible error in the first trial would be uncalled for and wasteful." (citation omitted)).

Instead, the circuit court should have been instructed, based on this record, as to whether CW's identification was sufficiently reliable to be admissible. The record here is sufficiently developed for a reviewing court to balance the factors required by Kaneaiakala. Indeed, as stated above, the parties presented argument on the HAWJIC 3.19A factors and the effect of suggestiveness on the reliability of the identification in briefing Jercy's motion to suppress.

For the sake of finality, we opine on the merits of Jercy's suppression motion below.

## C.    CW's identification was not sufficiently reliable.

In reviewing whether a show-up identification is sufficiently reliable for admissibility purposes, we are required, "at minimum," to consider the relevant factors in HAWJIC 3.19 and HAWJIC 3.19A, the "effect of the suggestiveness on the reliability of the identification," and "any other relevant factors[.]"  Kaneaiakala, 145 Hawai'i at 247-48, 450 P.3d at 777-78.  We may consider the entire record, including the trial record, to make this determination.  See State v. Kong, 77 Hawai'i 264, 266, 883 P.2d 686, 688 (App. 1994)  ("[W]hen deciding an appeal of the pretrial denial of the defendant's motion to suppress, the appellate court considers both the record of the hearing on the motion to suppress and the record of the trial.").

In this section, we evaluate the factors required by Kaneaiakala and determine that, under the totality of the circumstances, CW's identification was not sufficiently reliable for admissibility purposes.  Thus, Jercy's suppression motion should have been granted.

### 1.    HAWJIC 3.19 Factors

#### a.    The opportunity of the witness to observe the person involved in the alleged criminal act.

CW had an opportunity to observe her attacker.  CW's statement to HPD indicated that she "was able to turn around and

16

look at [Jercy] asking him why he attacked her." At trial, CW also testified that she was able to see Jercy's face during the incident.

This factor weighs **in favor** of concluding that CW's identification was reliable.

### b. The stress, if any, to which the witness was subject at the time of the observation.

CW was under substantial stress at the time of the observation--she was being attacked. This factor weighs **against** concluding that CW's identification was reliable. See State v. Cabagbag, 127 Hawai'i 302, 310 n.9, 277 P.3d 1027, 1035 n.9 (2012) (citing Deffenbacher, et al., A Meta-Analytic Review of the Effects of High Stress on Eyewitness Memory, 28 Law & Hum. Behav. 687 (2004) (finding "considerable support for the hypothesis that high levels of stress negatively impact . . . eyewitness memory")).

### c. The witness's ability, following the observation, to provide a description of the person.

CW provided a verbal statement describing the assailant to HPD prior to the field show-up. However, due to a language barrier, HPD was unable to document CW's description until after the field show-up. Thus, the documented description may have been influenced by CW's participation in the show-up procedure.

Although we find that this factor weighs **in favor** of

concluding that CW's identification was reliable, we assign it less weight because CW's documented description may have been influenced by the field show-up. See infra Section IV.C.3.

> **d. The extent to which the defendant fits or does not fit the description of the person previously given by the witness.**

CW's description, provided after the field show-up, indicated that the assailant was a 5'4"-to-5'6" male in his twenties to thirties with black hair and brown complexion. CW described the assailant as wearing a black long-sleeved jacket and a black facemask.

At the field show-up, Jercy was wearing a black short-sleeved t-shirt and dark blue jeans. Jercy testified that he is Chuukese and was 5'6" and 140 pounds on the day of the incident.

Aside from the shirt worn by the assailant, Jercy generally matched CW's description. Thus, this factor weighs **in favor** of concluding that CW's identification was reliable. However, this factor should hold slightly less weight because CW's description may have been influenced by her participation in the field show-up. See infra Section IV.C.3.

> **e. The cross-racial or ethnic nature of the identification.**

The field show-up did not involve cross-racial identification. Both CW and Jercy testified that they are Chuukese. This factor weighs **in favor** of concluding that CW's

18

identification was reliable.

> **f.    The witness's capacity to make an identification.**

CW testified that although she uses reading glasses and was not wearing them on the day of the incident, she did not need them to see Jercy.  There was no evidence relating to any other physical or mental limitations that hindered her ability to make an identification.  This factor weighs **in favor** of concluding that CW's identification was reliable.

> **g.    Evidence relating to the witness's ability to identify other participants in the alleged criminal act.**

There was no evidence of any other participants in the alleged criminal act.  This factor does not weigh into our analysis.

> **h.    Whether the witness was able to identify the person in a photographic or physical lineup.**

There was no evidence of a photographic or physical lineup being presented to CW for her identification.  This factor does not weigh into our analysis.

> **i.    The period of time between the alleged criminal act and the witness's identification.**

The field show-up occurred just over an hour after CW was attacked.  Because CW was able to participate in the field show-up shortly after the incident, this factor weighs **in favor** of concluding that CW's identification was reliable.

      **j.**    **Whether the witness had prior contacts with the person.**

CW had never seen Jercy prior to the day of the incident. There is no evidence suggesting that CW had prior contacts with Jercy.  This factor weighs **<u>against</u>** concluding that CW's identification was reliable, as CW's identification would have been more reliable had she had prior contacts with Jercy.

      **k.**    **The extent to which the witness is either certain or uncertain of the identification and whether the witness's assertions concerning certainty or uncertainty are well-founded.**

Following the field show-up, CW related to HPD that she was "sure that [Jercy] was the person who attacked her."  She stated at trial that she remembered Jercy from the incident.  However, there are concerns as to how "well-founded" CW's certainty was, given the suggestiveness of the field show-up.  See infra Section IV.C.3.  Further muddying the basis of CW's identification is CW's statement that the perpetrator was wearing a facemask during the incident.  Thus, we assign less weight to this factor, which weighs **<u>in favor</u>** of concluding that CW's identification was reliable.

      **l.**    **Whether the witness's identification is in fact the product of their own recollection.**

CW testified that her identification was based on her recollection of Jercy's face and indicated the same following the field show-up.  As with the previous factor, there is

20

concern about the effect the suggestiveness had on CW's recollection. See infra Section IV.C.3. We weigh this factor slightly **in favor** of concluding that CW's identification was reliable.

> **m.     Any other evidence relating to the witness's ability to make an identification.**

CW testified that the assailant was wearing a facemask when he was attacking her. Although CW stated that she could see his eyes and nose clearly, we find that the facemask negatively affected the reliability of CW's identification. This factor weighs **against** concluding that CW's identification was reliable.

### 2.     HAWJIC 3.19A Factors

> **a.     Whether the identification was the result of a suggestive procedure, including actions taken or words spoken by police or anyone else to the witness before, during, or after the identification process.**

On this record, this factor relating to the suggestiveness of the procedure overlaps with the effect of suggestiveness on the reliability of CW's identification. See infra Section IV.C.3. It is appropriate to consider the two factors as one.

> **b.     Whether the police either indicated to the witness that a suspect was present in the procedure or failed to warn the witness that the perpetrator may or may not be in the procedure.**

It appears that HPD indicated to CW that a suspect was

present in the field show-up.[6]  HPD Corporal John Agena (Corporal Agena), who met with CW at her home shortly after the attack, testified that HPD told CW prior to the field show-up that HPD "had a male in custody."  CW testified that HPD told her that "they found [the assailant and she] would identify him before [going] to the hospital."

HPD also apparently failed to inform CW that the perpetrator may or may not have been in the procedure.  Officer Tomishima, who accompanied CW during the field show-up, testified that he was unable to instruct CW that the perpetrator may or may not be present in the show-up due to the language barrier.

Because HPD was unable to warn CW that the assailant may or may not have been in the show-up procedure, this factor weighs **against** concluding that CW's identification was reliable.

> c. **Whether the defendant was required to wear distinctive clothing that the perpetrator allegedly wore, or was handcuffed or otherwise appeared to be in police custody.**

There is no evidence that Jercy was required to wear any distinctive clothing.  However, during the field show-up, Jercy was standing in front of a uniformed HPD officer with his hands

---

[6]     Body-worn camera footage capturing HPD's conversations with CW prior to the field show-up were never entered into the record.

handcuffed behind his back.[7]

Officer Tomishima testified that he was unable to see that Jercy was handcuffed from where he was in the ambulance as he accompanied CW during the field show-up. Although it is possible that CW did not see that Jercy was handcuffed, the parties did not dispute that Jercy "otherwise appeared to be in police custody," particularly given that he was standing in front of a uniformed HPD officer.

This factor weighs **against** concluding that CW's identification was reliable.

> **d. Whether the witness was exposed to opinions, descriptions, or identifications made by other witnesses, or to photographs, news media, or to any other information that may have influenced the independence of the identification.**

The record does not reflect that CW was exposed to any opinions, descriptions, or identifications made by other witnesses. The record does not suggest that CW discussed the assailant with neighbors Hernandez or Wainit. Officer Tomishima and Corporal Agena both testified that they did not prompt CW or suggest in any way the suspect's appearance prior to the field show-up.

However, it is possible that CW's identification was

---

[7]     Officer Benton testified that Jercy was handcuffed as a safety precaution, "due to the assault concerns."

influenced by HPD's statements regarding the field show-up procedure. On cross-examination, CW was asked, "Okay. The officers at your house, they told you they had the guy who attacked you, right?" CW answered, "Yes, they told me they found him, but I would identify him before I go to the hospital." This testimony suggests that CW believed her assailant would be present in the field show-up.

This potential bias may have influenced CW's identification. Accordingly, we find that this factor weighs **against** concluding that CW's identification was reliable.

### e. Whether other participants in the show-up were similar in appearance to the defendant.

There was no evidence of other participants in the field show-up. Thus, this factor does not weigh into our determination.

### f. Whether the witness's identification was made spontaneously and remained consistent thereafter.

It appears that CW's identification was prompted. In one of the HPD body-worn camera videos, as Jercy was walked to the back of the ambulance for the field show-up, someone--likely the emergency medical technician (EMT) who was sitting in the ambulance with CW--can be heard asking, "That's the guy? You can see him?" Immediately after, CW exclaimed at Jercy several times, "Why you punch me?" It is unclear from the video whether

CW said anything prior to the EMT prompting her.

Although it is possible that CW did not understand the EMT's prompting (due to the language barrier) and thus identified Jercy spontaneously, we hesitate to draw that conclusion. Instead, it is plausible that CW was prompted by the EMT's statements, particularly in light of our earlier concern about CW apparently being told that HPD found the assailant and she would identify him on the way to the hospital. CW's identification remained consistent thereafter.

Because CW's identification was likely prompted, we weigh this factor **against** concluding that CW's identification was reliable.

### g. Any other circumstance relating to the witness's ability to make an identification.

The field show-up occurred as CW was on the way to the hospital in an ambulance. CW was strapped to a gurney, wearing a neck brace, and attached to other medical equipment in the back of the ambulance. This was obviously a stressful situation for her that may have hindered CW's ability to make a reliable identification.

This factor weighs **against** concluding that CW's identification was reliable.

### 3. Effect of Suggestiveness on the Reliability of Identification

The ICA stated the following:

> The entire procedure was extremely suggestive, beginning with her testimony that "they told me that they found him" – with "they" meaning the police, to the dramatic diversion of an ambulance headed to the emergency room of a hospital, to the stressful identification from a gurney in the back of an ambulance prompted with repeated uniformed police queries of is that the guy, including the extreme suggestiveness that he was in fact the guy because he was in handcuffs, and physically restrained by a police officer, with multiple officers in the immediate vicinity. The [c]ircuit [c]ourt clearly erred in its findings and conclusions when it found and concluded that the identification was made "without any prompting." These are precisely the kind of circumstances that warrant trial court examination of the impact of suggestive procedures as a part of the reliability evaluation.

We generally agree with the ICA's assessment. We also reiterate that, prior to the field show-up, HPD did not document CW's description of the assailant or warn her that the assailant may or may not be present.

These circumstances indicate that the suggestiveness of the show-up procedure diminished the reliability of CW's identification. Accordingly, this factor weighs **against** concluding that CW's identification was reliable.

### 4. Totality of the Circumstances

Under the totality of the circumstances, we find that CW's identification was not sufficiently reliable to overcome the impermissible and inherent suggestiveness of the field show-up. More than half of the relevant factors weigh against concluding that CW's identification was reliable. Of those that weigh in

favor of finding the identification was reliable, half are dampened by HPD's inability, prior to the field show-up, to obtain a written statement from CW and warn CW that the perpetrator may or may not be present. In balancing the factors, we find that CW's identification was impermissibly influenced by the suggestiveness surrounding the field show-up.

In light of the Kaneaiakala court's concern that "misidentifications are one of the leading causes of wrongful convictions[,]" 145 Hawai'i at 242, 450 P.3d at 772, we conclude that CW's identification was not sufficiently reliable to overcome the suggestiveness of the field show-up. We therefore hold that Jercy's suppression motion should have been granted.

**D. The circuit court's error was not harmless beyond a reasonable doubt.**

Since Jercy's suppression motion should have been granted, we next analyze whether the court's error was harmless beyond a reasonable doubt. See State v. Jones, 148 Hawai'i 152, 165, 468 P.3d 166, 179 (2020) ("In a criminal case, if there is a reasonable possibility that error might have contributed to a conviction, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which the error may have been based must be set aside." (citation omitted)).

The State argues that even if the circuit court erred in admitting CW's identification evidence, such error was harmless.

The State reasons that "[b]ecause the jury was given an instruction based on HAWJIC 3.19A, the seven factors were addressed by the jury pursuant to that instruction." The State also asserts that "there was strong evidence identifying [Jercy] as the assailant even without [CW's] identification." The State's arguments are not persuasive.

First, it is unlikely that the circuit court's general instruction negated the prejudicial effect of the evidence of CW's identification. Cf. State v. Rogan, 91 Hawai'i 405, 415, 984 P.2d 1231, 1241 (1999) (holding that general instructions to jury that counsels' arguments were not evidence were unlikely to "negate[] the prejudicial effect" of the prosecutor's inflammatory comments). CW testified about her identification to the police while in the ambulance and identified Jercy as the assailant in open court on July 20, 2023. The circuit court did not read HAWJIC 3.19A to the jury until July 26, 2023, six days later. We cannot conclude that the erroneous admission of CW's identification was harmless beyond a reasonable doubt.

Second, the State's "strong evidence" identifying Jercy as the assailant was not nearly strong enough to render the circuit court's error harmless beyond a reasonable doubt. As this court has stated:

> With respect to assessing whether the erroneous admission
> of evidence was harmless beyond a reasonable doubt, . . .
> mere sufficiency of the evidence to support the jury

> verdict, apart from that aspect of the case affected by the error, would not be enough. However, . . . <u>where there is a wealth of overwhelming and compelling evidence tending to show the defendant [is] guilty beyond a reasonable doubt, errors in the admission or exclusion of evidence are deemed harmless.</u>

<u>State v. Spies</u>, 157 Hawai'i 75, 102, 575 P.3d 708, 735 (2025) (emphasis added) (cleaned up).

Here, the State posits that "there was ample evidence from the testimony of Mr. Hernandez that [Jercy] was the person who committed the offense." Although Hernandez did identify Jercy as the perpetrator, Hernandez also conceded that he lost sight of the assailant for ten to fifteen seconds. On the other hand, Jercy testified that he was on the way to work when Hernandez approached him at the bus stop and denied assaulting CW. From the trial testimony, a reasonable juror could have inferred that Hernandez misidentified Jercy as the assailant after briefly losing sight of CW's attacker. We thus cannot conclude that there was a "wealth of overwhelming and compelling evidence tending to show [that Jercy is] guilty beyond a reasonable doubt[.]" <u>Id.</u> at 102, 575 P.3d at 735.

Further, the State relied on CW's identification at trial, highlighting her identification in its opening statement and closing argument. CW also testified about her identification in the ambulance and identified Jercy as the assailant in open court. Accordingly, given the importance of CW's identification

29

to the State's case, there is "a reasonable possibility that the [circuit court's] error might have contributed to [Jercy's] conviction." Id. at 102, 575 P.3d at 735. We cannot conclude that the circuit court's admission of the identification evidence was harmless beyond a reasonable doubt.

On remand, evidence of CW's field show-up identification of Jercy shall be suppressed and excluded.

### V. CONCLUSION

The ICA's March 5, 2026 Judgment on Appeal is affirmed to the extent it vacated the circuit court's July 28, 2022 Findings of Fact, Conclusions of Law and Order Denying Defendant's Motion to Suppress Identification and the November 21, 2023 Amended Judgment of Conviction and Sentence. The case is remanded to the circuit court for further proceedings consistent with this opinion.

Robert T. Nakatsuji
for petitioner

Benjamin E. Lowenthal
for respondent

/s/ Vladimir P. Devens

/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

/s/ Lisa M. Ginoza

/s/ Lisa W. Cataldo

